IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

**MARK ANTHONY BURK**,

**Plaintiff**

v.                                                                           CIVIL NO. 14-1557 (GAG)

**ERIC PAULEN, MATT MORCHOWER,
and BALD BULL ENTERTAINMENT,**

**Defendants.**

### OPINION AND ORDER

The above-captioned case arises from the damages Mark Anthony Burk ("Plaintiff") allegedly suffered as a result of being fraudulently induced into an agreement with entertainment producers to pitch his idea of a reality television program to national television channels. Plaintiff filed suit invoking this court's diversity jurisdiction against Eric Paulen ("Paulen"), Matt Morchower ("Morchower"), and Bald Bull Entertainment ("BBE") (collectively "Defendants"), seeking redress for fraud in the formation of a contract, breach of contract, negligence, lack of good faith, and obstinacy. Plaintiff essentially claims that said Defendants are liable for the damages he suffered when Defendants fraudulently induced him into forming an agreement to promote his television program on the false premise that they have extensive industry contacts and then subsequently failed to fulfill their end of the bargain, in violation of Articles 1054, 1055, 1060, 1210, 1217, 1221, 1222, and 1802 of the Civil Code of Puerto Rico, P.R. LAWS ANN. tit. 31, §§ 3024, 3108-109, 3375, 3404, 3408-409, and 5154. (Docket Nos. 1 and 11-1.)

Presently before the court is Paulen and BBE's motion to dismiss Plaintiff's amended complaint pursuant to Fed. R. Civ. P. 12(b)(6), in which he argues that Plaintiff fails to state a

**Civil No. 14-1557 (GAG)**

single claim upon which relief can be granted. (Docket No. 20.) Plaintiff opposed Paulen and BBE's motion to dismiss. (Docket No. 32.) Paulen and BBE, in return, replied to Plaintiff's opposition. (Docket No. 33.)

After reviewing the pleadings and pertinent law, the Court **GRANTS** Paulen and BBE's motion to dismiss at Docket No. 20.

**I.   Relevant Factual and Procedural Background**

Plaintiff is a former professional golf player who succumbed to homelessness after falling on hard times both personally and professionally. (Docket No. 11-1 ¶ 10.) Prior to the facts comprising this case, Plaintiff participated in a documentary style television program, titled "Pipe Dream," which chronicled his recovery from homelessness through the help of golf and aired in January, 2011. (Id. ¶ 11.) A year later, on or about January, 2012, Plaintiff traveled to Puerto Rico to participate in a talk with La Fondita de Jesús, a local non-profit entity that is dedicated to provide food and shelter to homeless individuals in Puerto Rico. (Id. ¶ 12.) During that time, Plaintiff started to develop a television program that would succeed "Pipe Dream." (Id. ¶ 13.) Plaintiff met Arturo Díaz ("Díaz"), who began to assist him in the development of the program and provided Plaintiff with financial assistance during the development. (Id. ¶ 14.) Plaintiff also met Miguel Zayas Garcia ("Zayas"), who is the owner and President of a company dedicated to, among other things, the production of video footage. (Id. ¶ 15.)

By the end of 2012, Plaintiff and Zayas began to film a "sizzle reel" to promote and attract interest in Plaintiff's story to eventually obtain an agreement to produce a television program on the matter. (Id. ¶ 16.) In March, 2013, Zayas completed the sizzle reel. (Id.) Around April, 2013, Plaintiff began searching for executive producers with television network contacts that would

facilitate and better ensure the possibility of obtaining an agreement with a network to create the program. (Id. ¶ 17.) Plaintiff contacted Paulen, President of BBE, to inquire into whether he was interested in being an executive producer of the project because Paulen advertised himself as having ample experience in the field of entertainment programing. (Id. ¶ 18.) Specifically, Paulen stated that he had been part of multiple sports programming events, which Plaintiff understood to be helpful to fulfill his goal of obtaining a network program. (Id.) When contacting Paulen, Plaintiff suggested that Paulen view his completed sizzle reel. (Id. ¶ 19.)

Thereafter, on April 18, 2013, Paulen told Plaintiff that he had reviewed the sizzle reel and that he was going to speak with his partner, whose name he did not disclose, about whether they would agree to have BBE produce the program. (Id. ¶ 20.) Around the beginning of May, 2013, Paulen traveled to Puerto Rico to meet with Plaintiff and Díaz. (Id. ¶ 21.) In this meeting, Paulen told both of them that he was an executive producer of the Travel Channel program "Ghost Adventures" and that he was friends with the president of that channel. (Id.) Paulen also stated that he wanted to speak with Zayas about the quality of Plaintiff's sizzle reel and that they would have to "package" Plaintiff and "throw him out there," which his partner would take care of. (Id. ¶¶ 22-23.) Also during that meeting, Díaz stated that he wanted to bring José Rivera Vaquer ("Rivera") into the project as a writer for the program. (Id. ¶ 24.) Paulen agreed to this addition after discussing with his partner. (Id.)

Around the beginning of July, 2013, Plaintiff, Paulen, Zayas, and Rivera participated in a conference call in which Zayas asked Paulen if he was capable of getting the program on a television network. (Id. ¶ 25.) Paulen responded by referencing his past experiences and his connections and abilities to negotiate with the Travel Channel and other networks that would be

3

interested in a sports related documentary. (Id. ¶ 26.) Specifically, Paulen stated that within three minutes, he could get the sizzle reel to the president of the Travel Channel. (Id.) As a result of these representations, Plaintiff agreed to have Paulen produce the program because he believed that Paulen's connections would best ensure that he obtain an agreement with a network. (Id. ¶ 27.) During the same telephone conference, Paulen also asked Zayas to extend and improve the sizzle reel and specifically spoke of working toward a network deal with the Travel Channel. (Id. ¶ 28.) As a result, Zayas recorded Plaintiff while performing additional tasks for the reel and in early December 5, 2013, Zayas completed the reel and sent a copy to Paulen. (Id. ¶¶ 29-30.)

Shortly thereafter, Paulen spoke to Plaintiff and informed him that he was disappointed with the reel and that he would re-edit it to his liking. (Id. ¶ 31.) Plaintiff and Zayas then sent all of the original footage to Paulen in the month of January, 2014. (Id.) On or about January 20, 2014, Díaz called Paulen to inquire as to when the new sizzle reel would be ready and Paulen said it would be ready by February 1, 2014. (Id. ¶ 33.) During that conversation, Díaz asked Paulen if he was committed to the project and Paulen answered affirmatively. (Id.)

February 1, 2014 arrived, and the new sizzle reel was not ready. (Id. ¶ 34.) Plaintiff spoke with Paulen several times in the beginning of February and Paulen repeatedly told him that it would be ready by February 15, 2014. (Id. ¶ 35.) On February 15, 2014, Paulen had not finished the new reel nor had he spoken with any network executives regarding the program to date, despite having the original reel in his possession. (Id. ¶¶ 33, 36.) Nearing the end of February, 2014, Paulen wrote to Díaz and informed him that the new reel would be ready by March 1, 2014 and that he wished to travel to Puerto Rico to evaluate the capabilities of Zayas and his company, with his expenses to be covered by Díaz. (Id. ¶ 37.) Two days before arriving in Puerto Rico, Paulen

**Civil No. 14-1557 (GAG)**

revealed the name of his partner to be Morchower. (Id. ¶ 38.) Thereafter, while in Puerto Rico, Paulen met with Plaintiff, Díaz, and Zayas to play the new sizzle reel, and Díaz was satisfied with the product. (Id. ¶ 39.) Further, Paulen told them that a network could be paying upwards of $200,000.00 per episode for the program, and considering that they had previously settled on creating a ten-episode program, the deal was worth $2,000,000.00. (Id.) Paulen then stated that he was going to present the reel to Morchower and confer with him the next steps. (Id. ¶ 40.)

After reviewing the reel, Morchower informed Paulen that he needed to add a voiceover, which Plaintiff promptly did. (Id. ¶ 41.) On or about April 1, 2014, Plaintiff spoke directly with Morchower for the first time, during which Morchower told him that they had hired an agent to "shop the reel" and that agent was engaging all potential networks, but the Travel Channel was not one of the choices at that point. (Id.) However, Plaintiff had never sought out an agent nor agreed to have an agent or manager for this project. (Id. ¶ 42.)

At the end of March, 2014, Díaz decided to no longer be a part of the production team because he became skeptical of Paulen's access to the networks. (Id. ¶ 43.) As a result, Plaintiff's economic situation was greatly affected. (Id. ¶ 44.) Further, up to that point in time, Paulen had apparently not contacted any person at any television network to get the program produced. (Id. ¶ 45.) Plaintiff had entrusted Paulen exclusively with the task of reaching an agreement with a network because of the representations he had made to Plaintiff regarding his contacts in the television industry. (Id. ¶ 46.) It had begun to seem that Paulen neither had any intention of pitching the program to a network nor did he have the contacts and experience that he represented to Plaintiff. (Id.)

5

Thereafter, Plaintiff contacted Ross Greenberg ("Greenberg"), a renowned television producer, in a desperate attempt to move the project forward with the goal of reaching a network agreement. (Id. ¶ 47.) In April, 2014, Paulen met with Greenberg, after he had been contacted by Plaintiff. (Id. ¶ 48.) After the meeting, Paulen called Plaintiff and stated that he was furious with Plaintiff for having contacted Greenberg. (Id.) He then called Zayas and told him that Greenberg was not interested in the program, blaming Plaintiff for his decision. (Id.) This was the only effort made by Paulen to promote the program. (Id. ¶ 49.)

In early May, 2014, Paulen spoke with Plaintiff and told him that they would likely have to bring another producer into the project, and, as such, Plaintiff could no longer be considered a producer of the program; rather, he would be credited as a co-producer. (Id. ¶¶ 50-51.) In that same conversation, Plaintiff asked Paulen about Zayas's roll in the project and Paulen responded that Zayas was no longer a member of the team and would appreciate if Plaintiff did not bring his name up again. (Id. ¶ 52.) By July, 2014, Plaintiff did not hear back from Paulen regarding any new shopping of the sizzle real. (Id. ¶¶ 53-55.) Up until that time, Paulen had done nothing to promote the project other than meet with Greenberg one time. (Id. ¶ 55.) Having relied upon Paulen's representations that he was a television producer with great rein over that business, Plaintiff's economic situation was greatly impacted and continues to suffer to this day. (Id. ¶¶ 55-56.) Plaintiff is once against indigent and has had to move multiple times because he has been unable to comply with his financial responsibilities. (Id. ¶ 56.)

Plaintiff then filed this suit, claiming that Paulen, his company BBE, and Morchower fraudulently induced him into forming an agreement to promote his television program on the false premise that they have extensive industry contacts and then subsequently failed to fulfill their end

**Civil No. 14-1557 (GAG)**

of the bargain. (Docket Nos. 1 and 11-1.) Thereafter, Paulen and BBE filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing that Plaintiff's amended complaint fails to state any claim upon which relief can be granted. (Docket No. 20.) Morchower answered Plaintiff's amended complaint and raised the affirmative defense that the court lacks personal jurisdiction over him. (Docket No. 31.) Plaintiff opposed the motion to dismiss. (Docket No. 32.) Paulen in return replied to Plaintiff's opposition. (Docket No. 33.)

**II.   Standard of Review**

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, see FED. R. CIV. P. 12(b)(6), the court analyzes the complaint in a two-step process under the current context-based "plausibility" standard established by the Supreme Court. See Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citing Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) which discusses Ashcroft v. Iqbal, 556 U.S. 662 (2009) and Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)). First, the court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." Schatz, 669 F.3d at 55. A complaint does not need detailed factual allegations, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678-79. Second, the court must then "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." Schatz, 669 F.3d at 55. Plausible, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels the court to draw on its judicial experience and common sense. Id. (citing Iqbal, 556 U.S. at 678-79). This "simply calls

for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. Twombly, 550 U.S. at 556.

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)). If, however, the "factual content, so taken, 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' the claim has facial plausibility." Ocasio-Hernández, 640 F.3d at 12 (quoting Iqbal, 556 U.S. at 678).

### III. Discussion

In Paulen and BBE's motion to dismiss at Docket No. 20, those defendants argue that Plaintiff fails to state any claim for breach of contract, fraud in the formation of a contract, negligence, lack of good faith, or obstinacy upon which relief can be granted. The court will address each claim in turn.

#### A. Breach of Contract

In moving to dismiss Plaintiff's breach of contract claim, Paulen argues that said claim fails as a matter of law because the agreement lacked consideration, and, as such, no valid contract existed between the parties for there to be a breach. (Docket No. 20 at 7.) Paulen also argues in the alternative that, assuming there was a valid contract, there was no breach because he never guaranteed that he would be able to secure a network deal and Plaintiff did not sustain any damages as a result of his failure to secure such a deal. (Id. at 8-9.) Plaintiff responds by arguing that there was indeed a valid contract and he sustained damages because the demise of his project

resulted from Paulen's failure to follow through with his promise to make a reasonable effort to obtain a network deal. (Docket No. 32 at 4-6.)

The Puerto Rico Civil Code provides that "[a] contract exists from the moment one or more persons consent to bind himself or themselves, with regard to another or others, to give something or to render some service." P.R. LAWS ANN. tit. 31, § 3371. Such contract shall be binding, in whatever form it may be, provided the essential conditions required for its validity exist. P.R. LAWS ANN. tit. 31, § 3451. To form a valid, binding contract, there must be: (1) consent of the parties, (2) an object of the contract, and (3) cause for the obligation, i.e., consideration. P.R. LAWS ANN. tit. 31, § 3391; Puerto Rico Elec. Power Auth. v. Action Refund, 515 F.3d 57, 63 (1st Cir. 2008). The agreement need not be in writing, as verbal contracts are valid and enforceable. Colon v. Blades, 570 F. Supp. 2d 204, 210 n.7 (D.P.R. 2008). Where a party fails to uphold or abide by the terms and conditions of a binding contract, his failure constitutes a breach of that contract. Markel Am. Ins. Co. v. Diaz-Santiago, 674 F.3d 21, 31 (1st Cir. 2012) ("the elements of a cause of action for breach of contract under Puerto Rico law include '1) a valid contract and 2) a breach by one of the parties to the contract'").

Turning to the facts of the present case, it is clear that, as pleaded, the first two requirements of a valid contract exist. First, with respect to the consent of the parties, Plaintiff alleges that he asked Paulen if he was interested in being an executive producer, whereby he would attempt to obtain a network deal for Plaintiff's program, and Paulen agreed that he and his company would produce the program. Second, the object of the contract was that Paulen would attempt to find a network deal for Plaintiff's program. Plaintiff's claim falters, however, with respect to the third requirement: the cause for the obligation. Nowhere in Plaintiff's complaint

does he allege that Paulen was paid for his services nor that there were any discussions or agreements related to compensation in any shape or form for Paulen should a network deal come to fruition. Although, as a general principle of contract law, "courts will not inquire into the adequacy of consideration in an agreed-upon exchange, unless that consideration is so grossly inadequate as to shock the conscience of the court," <u>Action Refund</u>, 515 F.3d at 64 (internal quotation marks omitted), here, Plaintiff fails to allege *any* consideration in his purported bargained-for exchange. <u>See</u> P.R. LAWS ANN. tit. 31, § 3432 ("Contracts without consideration or with an illicit one have no effect whatsoever."). More so, Plaintiff's flaw is even more apparent from his skirting around the consideration requirement in his reply brief.

Therefore, the court finds that Plaintiff fails to sufficiently allege that a binding contract existed between him, Paulen and BBE, and, as such, his breach of contract claim must fail as a matter of law. Accordingly, the court hereby **GRANTS** the motion to dismiss as to Plaintiff's breach of contract claim and thus **DISMISSES** said claim.

B.  <u>Fraud in the Formation of the Contract</u>

With respect to Plaintiff's fraud in the formation of a contract claim, Paulen argues that said claim fails because Plaintiff does not sufficiently allege three of the necessary elements of fraud: (1) a misrepresentation or omission by Paulen; (2) a loss sustained by Plaintiff; and (3) a causal connection between the Plaintiff's damages and the misrepresentation. (Docket No. 20 at 4-6.) Plaintiff responds by arguing that he has indeed sufficiently pleaded a claim of fraud which affects a contracting party's consent, known as "dolo" under Puerto Rico law, because Plaintiff would not have formed an agreement with Paulen had Paulen not greatly exaggerated his extensive industry contacts, skills, and abilities. (Docket No. 32 at 6-9.)

10

**Civil No. 14-1557 (GAG)**

Under Puerto Rico contract law, fraud that affects a contracting party is commonly referred to as "dolo" or deceit, Fournier v. Eastern Airlines, Inc., 655 F. Supp. 1037, 1038-39 (D.P.R. 1987), and can be manifested in one of two situations. See Portugues-Santana v. Rekomdiv Int'l, 657 F.3d 56, 59-60 (1st Cir. 2011). One application refers to dolo in the formation of a contract and the other refers to dolo in the performance of the contractual obligations. Id. In the present case, Plaintiff is alleging that Defendants committed dolo in the formation of the contract. As noted in **part II.A** of this opinion, consent of both parties is a necessary requirement of a valid contract. As such, the Civil Code provides that when consent by a party is consummated by the deceit of another, any agreement that might have been the fruit of those negotiations can considered be null and void. See P.R. Laws Ann. tit. 31, § 3404 ("Consent given by error, under violence, by intimidation, or deceit shall be void."). Such deceit occurs "when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made." P.R. Laws Ann. tit. 31, § 3408; Portugues-Santana, 657 F.3d at 62.

The First Circuit has recognized that the first application of this doctrine is essentially fraud in the inducement. See Portugues-Santana, 657 F.3d at 62 (holding that a party alleging dolo in the formation of a contract must demonstrate: "(1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon; (3) injury to the plaintiff as a result of the reliance; and (4) an intent to defraud"). That being said, the courts have also recognized that dolo and fraud are not synonymous concepts, as "Puerto Rico's Supreme Court has described dolo as the genus and fraud as one of its several species alongside with deceit, false representations, undue influence, and other insidious machinations." Generadora De Electricidad Del Caribe, Inc. v.

11

**Civil No. 14-1557 (GAG)**

Foster Wheeler Corp., 92 F. Supp. 2d 8, 19 (D.P.R. 2000); Marquez v. Torres Campos, 111 P.R. Dec. 854, 11 P.R. Offic. Trans. 1085, 1096 (1982) ("[Dolo in the formation of a contract] includes deceit, fraud, misrepresentation, undue influence, etc.").

> It follows, then, that a fact pattern involving contract fraud will always involve 'dolo,' but a fact pattern involving 'dolo' will not always involve fraud. The concept of 'dolo,' therefore, includes fraud as its most heightened species, but also includes other less heightened modes such as 'undue influence' and 'insidious machination.' Indeed, 'dolo' may be manifested by the presence of malice or intent without accompanying false representations, belief in false representations, or detrimental reliance. Such would be the case of a party who contracts or performs a contract through undue influence or with insidious machinations, but not with fraud.

Generadora De Electricidad Del Caribe, Inc., 92 F. Supp. 2d at 19. Furthermore, dolo can be considered either "substantial" ("grave"), when it determines the consent of a party, or "incidental" when it merely influences the consent. P.R. LAWS ANN. tit. 31, § 3409; P.C.M.E. Commercial, S.E. v. Pace Membership Warehouse, Inc., 952 F. Supp. 84, 92 (D.P.R. 1997). An agreement which wholly lacks the necessary consent due to "substantial dolo" results in the nullity of the contract *ab initio* from its inception, whereas "incidental dolo" merely gives rise to a claim for damages. P.R. LAWS ANN. tit. 31, § 3409; Pace Membership Warehouse, Inc., 952 F. Supp. at 92. When an obligation becomes a nullity, the appropriate remedy is to for the parties "to restore each other the things which would have been the object of the contract with their fruits, and the value with its interest, without prejudice to the provisions contained in the following sections." P.R. LAWS ANN. tit. 31, § 3514; Century Packing Corp. v. Giffin Specialty Equip. Co., LLC, 438 F. Supp. 2d 16, 26 (2006).

Lastly, dolo, like fraud, is not presumed, and the party alleging dolo bears the burden of proof. Pace Membership Warehouse, Inc., 952 F. Supp. at 92. "In order to prove dolo [the party]

would have to demonstrate the intentional fault or bad faith of the person to whom it is imputed, given that good faith is presumed." Id. at 93 (quoting Citibank v. Dependable Ind. Co., 121 P.R. Dec. 503, 519 (1987)). "A person's education, his social and economic status, his relations, and the type of business in which he is engaged are significant when trying to determine the existence of 'dolo' that would void his consent." Citibank, 21 P.R. Offic. Trans. 496.

Turning to the present case, the court first notes that, despite Paulen's arguments under the traditional elements of fraud, it agrees with Plaintiff that it need not strictly adhere to those elements. As noted above, dolo in the formation of a contract has subtle differences from fraud in the inducement, and dolo can be found to exist without a finding of all of the necessary facts constituting fraud. However, Plaintiff is still required to sufficiently plead that Paulen acted with intentional fault or bad faith to deceive him when discussing the formation of an agreement between the parties because good faith on the party of contracting parties is "always presumed." See Citibank Global Markets, Inc. v. Rodriguez Santana, 573 F.3d 17, 29 (1st Cir. 2009); Pace Membership Warehouse, Inc., 952 F. Supp. at 92.

In the complaint, Plaintiff alleges that Paulen told Plaintiff and the rest of the team that he had strong connections to the Travel Channel, including that he was friends with the president of that channel and could get the sizzle reel to the president in three minutes. (Docket No. 11-1 ¶¶ 21, 26.) Paulen further emphasized his other television industry connections and his abilities to negotiate with those connections to pitch the program. (Id. ¶¶ 18, 26.) Although Plaintiff claims that Paulen greatly exaggerated his skills, abilities, and knowledge of the industry to the point that they were deceitful, he fails to allege how Paulen exaggerated such. Further, Plaintiff contends that "[i]n fact, some of the claims made by Paulen were simply not true," (Docket No. 11-1 ¶ 59),

but fails to allege which of those claims are not true.  While "[a] mischievous act is not needed" for a claim for contractual deceit, Plaintiff must still allege Paulen's "knowledge of [his] own lack of compliance, with the consciousness that [Plaintiff's] expectations will be affected." Century Packing Corp., 438 F. Supp. 2d at 16 (citing Mayaguez Hilton Corp. v. Betancourt, 156 P.R. Dec. 234, 253 (2002)).  As such, although Paulen might not have followed through with contacting those connections, including the Travel Channel, that does not allow for the inference that he was exaggerating or lying about said connections or his abilities to contact them.

Therefore, when viewing the well-pleaded facts in the amended complaint and drawing all reasonable inferences in Plaintiff's favor, the court finds that Plaintiff fails to show this court how Paulen consummated Plaintiff's consent by deceit.  Accordingly, the court hereby **GRANTS** the motion to dismiss as to Plaintiff's dolo claim and thus **DISMISSES** said claim.

C. Negligence Claim

With respect to Plaintiffs' negligence claim, Paulen argues that said claim fails because Plaintiff fails to sufficiently allege that he owed a duty to Plaintiff, that he breached that duty, or that Plaintiff suffered any damages.  (Docket No. 20 at 9-10.)  In response, Plaintiff argues that his damages stem from Paulen's failure to meet his obligation under the contract, that is, his duty to promote the program.  (Docket No. 32 at 6-7.)  As such, Plaintiff argues that Paulen is liable under Puerto Rico's negligence law, Article 1802 of the Civil Code.  (Id.)

Although Paulen argues for dismissal of Plaintiff's negligence claim because he owed no duty to Plaintiff and Plaintiff sustained no damages, (Docket No. 20 at 9-10), the court finds that this claim must be dismissed for another reason.  A review of the complaint reveals that Plaintiff is claiming that his damages arising from Defendants' alleged negligence arise from Defendants'

14

alleged breach of contract because the duty under the purported contract is the same as the duty arising out of the negligence claim—that being the duty to promote his program to reach a network deal. (See Docket 11-1 ¶¶ 74-77.)  Specifically, Plaintiff alleges that "Defendants were, at the very least, negligent for, among other reasons, failing to promote the program in anyway."  (Id. ¶ 77.)  This contention is inexorably clear upon reviewing Plaintiff's response to Paulen's motion to dismiss because he solely argues that Paulen breached the duty under the purported contract between them.  (See Docket No. 32 at 6-7.)  As such, the resolution of this issue is simple.

"Article 1802 negligence applies in cases where the party causing the injury had no prior obligation or duty to the party suffering the injury."  Nieves Domenech v. Dymax Corp., 952 F. Supp. 57, 65 (D.P.R. 1996) (citing Ramos Lozada v. Orientalist Rattan Furniture, Inc., 130 P.R. Dec. 712 (1992)).  As such, Article 1802 generally does not apply in the context of commercial transactions.  Isla Nena Air Servs., Inc. v. Cessna Aircraft Co., 449 F.3d 85, 88 (1st Cir. 2006).  However, "[a] plaintiff may bring a negligence claim based on a contractual relationship when there is both an alleged breach of contract *and* an alleged breach of the general duty not to negligently cause injury."  Nieves Domenech, 952 F. Supp. at 66 (citing Ramos Lozada, 130 P.R. Dec. 712).  But, this general duty not to act negligently must arise out of conditions *separate* from the parties' contract.  Id.  Therefore, if Plaintiff's damages arise exclusively from Defendants' alleged breach of contract, Plaintiff does not have a separate cause of action for negligence.  Id.  And, as noted above, Plaintiff does exactly that: he rests his negligence claim upon Paulen's alleged contractual duty to promote his program.

Furthermore, although the complaint states that "Defendants were, at the very least, negligent for, *among other reasons*, failing to promote the program in anyway," (Docket No. 11-1

15

¶ 77), "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). As such, the court will not ponder as to whether Plaintiff sought to impose another duty upon Defendants. "Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." Id. (internal quotation marks omitted). Thus, Plaintiff's negligence claim as affirmatively pleaded fails as a matter of law.

Accordingly, in light of the aforementioned reasoning, the court hereby **GRANTS** the motion to dismiss as to Plaintiff's negligence claim and thus **DISMISSES** said claim.

### D. Lack of Good Faith Claim

With respect to Plaintiffs' lack of good faith claim, Paulen argues that said claim fails because assuming there was a contract, he acted according to the express terms of the contract by attempting to obtain a television production deal for the program. (Docket No. at 11.) Plaintiff failed to specifically respond to this argument. (See Docket No. 32.)

The resolution of this issue is also relatively simple. In the complaint, Plaintiff alleges that Defendants acted in bad faith in both the formation of the contract and in the execution of their duties under the contract because Paulen made false representations about his experience and qualifications and failed to pitch the program as agreed upon. (Docket No. 11-1 ¶¶ 79-83.) However, as already discussed in **part II.B** of this opinion, Plaintiff has failed to sufficiently allege any bad faith on part of Paulen or knowledge of his own lack of compliance in the formation of the purported contract. As such, Plaintiff has not properly pleaded that Paulen lacked good faith in any pre-contractual negotiations. Furthermore, although Puerto Rico law imposes the duty of

**Civil No. 14-1557 (GAG)**

good faith performance on contracting parties in the performance of a contract, a valid contract must be alleged for this analysis to be applicable. See P.R. LAWS ANN. tit. 31, § 3375 (1991) ("Contracts are perfected by mere consent, and from that time they are binding . . . with regard to all the consequences which, according to their character, are in accordance with *good faith*, use, and law."); Adria Int'l Group, Inc. v. Ferré Dev., Inc., 241 F.3d 103, 108 (1st Cir. 2001) (noting where parties do not enter into a binding contract, obligations are not subject to the duty of good-faith performance). And, as noted in **part II.A** of this opinion, Plaintiff has failed to sufficiently allege that there was a valid, binding contract between the parties in this case.

Accordingly, for the aforementioned reasons, the court hereby **GRANTS** the motion to dismiss as to Plaintiff's lack of good faith claim and thus **DISMISSES** said claim.

E.      Obstinacy Claim

Lastly, Paulen moves to dismiss Plaintiff's obstinacy claim, in which Plaintiff requests reimbursement for all of his legal expenses and costs if Defendants continue to delay payment of Plaintiff's damages. (Docket No. 32 at 11.) Paulen argues that attorney's fees are unwarranted, particularly considering the fact that Plaintiff's counsel is court appointed pro bono. (Id.) Plaintiff failed to respond to this argument. (See Docket No. 32.)

Puerto Rico law, which governs attorney's fees issues in diversity cases, "provides that in the event that any party or its lawyer acted obstinately or frivolously, the court shall impose on such person the payment of a sum of attorney's fees, which, in its judgment the court corresponds to such conduct." Citibank Global Markets, Inc., 573 F.3d at 30 (citing P.R. R. Civ. P. 44.1(d)). Therefore, "a finding of obstinacy requires that the court determine a litigant to have been

**Civil No. 14-1557 (GAG)**

unreasonably adamant or stubbornly litigious, beyond the acceptable demands of litigation, thereby wasting time and causing the court and the other litigants unnecessary expense and delay." Id.

In light of the facts that this litigation is the initial pleading stage and Paulen has not taken any action to delay this case, the court rejects Plaintiff's claim for attorney's fees.  Notably as well, Plaintiff's attorney is pro bono.  More so, the court has dismissed the other four claims in this cause of action against Paulen and BBE.

Accordingly, the court hereby **GRANTS** the motion to dismiss as to Plaintiff's obstinacy claim and thus **DISMISSES** said claim.

IV.   **Conclusion**

In sum, the Court **GRANTS** Paulen and BBE's motion to dismiss at Docket No. 20 and **DISMISSES** all claims and causes of actions against those two Defendants.

**SO ORDERED.**

In San Juan, Puerto Rico this 9th day of April, 2015.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge